Filed 11/21/24 subsequently modified (order attached)

# SUPERIOR COURT OF CALIFORNIA

# COUNTY OF SANTA CLARA

# APPELLATE DIVISION

| | |
|---|---|
| ISAAC GABRIEL GONZALES,<br><br>     Defendant and Petitioner,<br><br>v.<br><br>SUPERIOR COURT OF SANTA CLARA COUNTY, (Limited Jurisdiction),<br><br>     Respondent,<br><br>THE PEOPLE,<br><br>     Real Party in Interest. | No. 23AP002906<br><br>Trial Ct. No. C2215191<br><br><br>OPINION |

Isaac Gabriel Gonzales is charged with a single count of misdemeanor resisting arrest in violation of Penal Code section 148, subdivision (a)(1).[1] In the trial court, Gonzales filed a motion seeking disclosure under section 745, subdivision (d) (section 745(d)) as part of the California Racial Justice Act of 2020 (RJA) (Stats. 2020, ch. 317, § 1) of specified information from which to conduct statistical analyses for a potential RJA violation of section 745, subdivision (a)(3) (section 745(a)(3)), on the basis of his identity as Hispanic or Latinx and historical racial disparities in arrest and prosecution in Santa Clara County as identified in available resources.[2] The People, real party in interest here, opposed the motion. At the motion hearing, Gonzales expanded the basis of his discovery request to also encompass a potential violation of section 745, subdivision (a)(1) (section 745(a)(1)), contending that a defendant need not isolate the particular form of the potential violation of the RJA as those are listed at section 745, subdivisions (a)(1) through (a)(4) when seeking disclosure under section 745(d) and that information concerning one form of an RJA violation may be corroborative of another.

The trial court denied Gonzales's motion in a written order, concluding that "good cause" for the requested discovery had not been shown in that the threshold of a plausible factual foundation was lacking for either means of establishing an RJA violation. (§ 745(d); see *Young v. Superior Court* (2022) 79 Cal.App.5th 138, 144, 159 (*Young*).) Having so found—whether under section 745(a)(1) or (a)(3)—the trial court did not proceed to address the six other so-called "*Alhambra*" factors that bear on the good cause showing and that affect the scope of discovery that might be allowed as part of a discretionary weighing and balancing of those factors. (*Young, supra,* 79 Cal.App.5th at pp. 144–145, 168–169 [incorporating into § 745(d) multi-

---

[1] Further unspecified statutory references are to the Penal Code.
[2] Gonzales self-identifies in his papers as "Hispanic" or "Latinx." In deference to that designation, we will use one or the other of these terms in this opinion.

factor test set forth in *City of Alhambra v. Superior Court* (1988) 205 Cal.App.3d 1118, 1134 (*Alhambra*) for trial court's exercise of discretion and gatekeeping functions in evaluating subpoenaed third-party records in criminal cases]; see *Facebook, Inc. v. Superior Court* (*Touchstone*) (2020) 10 Cal.5th 329, 344–347 (*Facebook*) [denoting these considerations "the '*Alhambra*' factors"].)

Gonzales petitioned for relief in mandate challenging the trial court's order. We issued an order to show cause after requesting preliminary opposition from the People. The matter was then fully briefed and argued, and supplemental briefing on specific issues followed.[3]

Concluding that the trial court required a showing by Gonzales of a plausible factual foundation as the threshold of good cause that is more onerous than required for disclosure under section 745(d), and that Gonzales had minimally proffered a plausible factual foundation for a potential violation of the RJA, we grant the petition, direct the trial court to vacate its denial order, and remand the matter for further proceedings consistent with this opinion, including for the trial court to exercise its discretion by applying the *Alhambra* factors as a whole to the most recent iteration of Gonzales's disclosure request and, as warranted, tailoring the scope of any ordered disclosure in consideration of all these other factors.

STATEMENT OF THE CASE

I.  *Procedural Background*

A.  Trial Court

According to the police report as described in the trial court's written ruling, on September 22, 2022, "officers were dispatched to a call of a domestic violence incident involving two individuals." Gonzales was not one of them but he "had been

---

[3] We also allowed the filing of briefs by three amici curiae in support of petitioner Gonzales. They are the American Civil Liberties Union of Northern California, Silicon Valley De-Bug, and Assemblymember Ash Kalra, the author of Assembly Bill 2542, the RJA. The People filed combined responsive briefing to the amici curiae filings and we have considered all briefing in the course of our review.

drinking with the two individuals involved" in the incident. "While the officers were conducting their investigation, [] Gonzales ran to the scene and refused to step aside … . [He] repeatedly approached the officers and one of [them] was forced to push him away. The officers attempted to get [] Gonzales to leave, but [he] kept antagonizing the officers, yelling racial slurs and obscenities at [them. He] told one officer, 'Shut your bitch ass up, [n-word ending in er].' At one point, [] Gonzales was posturing, balling his fists and getting in the officer[s'] faces like he was ready to fight. Officers then attempted to restrain [] Gonzales before he attacked. After [] Gonzales was arrested, he called one of the officers a 'Little Asian [n-word ending in a].' Later, [] Gonzales made comments that it was his fault, he deserved it, [saying,] 'I stand what I stand for, I did it to myself, situations like this I put myself into.' "

Gonzales is charged by complaint filed on November 7, 2022, with a single count of misdemeanor resisting arrest stemming from the incident. (§ 148, subd. (a)(1).)

Some weeks later, Gonzales filed an RJA motion for discovery under section 745(d). The motion identified the sole basis of the RJA violation being pursued as that provided at section 745(a)(3)—for disparity in charging misdemeanor resisting-arrest violations based on race. It identified Gonzales as a "22-year-old Latinx man," charged with a stand-alone violation of section 148, subdivision (a)(1). The motion argued that its supporting data and information showed that historically in Santa Clara County, "the charging of Latinx individuals with a violation of [] section 148(a)(1) occurs at a rate disproportionate to their non-Latinx counterparts." He requested from the District Attorney's Office (DAO) a list of all arrest data between January 1, 2015, and December 19, 2022, relating to section 148, subdivision (a)(1) cases, including case numbers and names of those charged;

4

their races, ethnicities or national origins; unredacted copies of the police reports from those cases; and the final disposition of each case.[4]

The data and records referenced in or accompanying the motion included "internal data" from the Public Defender's Office (PDO) showing "that since January 1, 2018, there have been a total of 6,413 [d]efendants represented by the PDO who were charged with violating [] section 148(a)(1) and 3,313 of those individuals are Latinx, making it 51% of individuals charged." (Fn. omitted.) The motion also referenced the DAO's published "Race and Prosecutions Report: 2022 Update," characterized in the moving papers as recognizing "disparities in charging violations of [] section 148(a)(1). As of 2021, Latinx individuals make up 52% of misdemeanor cases and 68% of misdemeanor resisting arrest yet make up only 25% of Santa Clara County's population according to the most recent U.S. Census." (Fns. omitted.) The moving papers also cited to a "recent report examining race disparities in Santa Clara County for the past three decades," which "confirms that while Latinx individuals [make up] 25% of the population, they have consistently made up 48% of misdemeanor arrests for the past two decades. Latinx people are also overrepresented across all four decades, second only to Black people." (See Sophia Hunt, Micayla Bozeman & Matthew Clair, *Racial Disparities in Arrests in Santa Clara County, California, 1980–2019* (Oct. 2022) SocArXiv Papers <https://osf.io/preprints/socarxiv/9un7v> [as of Nov. 13, 2024].)

Gonzales's motion thus urged that having made some showing of disparity in the charging of Latinx individuals in Santa Clara County as compared to the county population as a whole, as suggested by the proffered and available information, the records and data requested from the DAO were relevant to show

---

[4] The scope of the discovery request in Gonzales's initial moving papers in the trial court did not specify the agency from which the "list of arrest data" and unredacted copies of police reports were sought. The expanded request in a supplemental filing below suggests that his original discovery request referenced information from the San Jose Police Department (SJPD).

an RJA violation as they "would have a tendency to show that Latinx [d]efendants are disproportionately charged … when compared to non-Latinx defendants." "Further, statistical discovery will 'bolster this claim and rationally tie it to prosecutorial decision-making, at least as a prima facie matter,'" quoting *Young, supra*, 79 Cal.App.5th at page 178.

The People opposed the motion on several grounds. These included that the temporal scope of Gonzales's request was overbroad in that the DAO had changed its charging policies for stand-alone violations of section 148, subdivision (a)(1) in mid-2020—some two years before the incident leading to this charge—such that no such charges will now be brought in the absence of "extraordinary circumstances, like when someone is trying to prevent a police officer from contacting a witness, … [which] has resulted in a steep drop in the number of persons charged for this offense"; that the temporal component of Gonzales's request was additionally overbroad in that other forces in 2020 and 2021 in particular, such as the need to reduce jail populations and limited courtroom availability during the Covid-19 pandemic, skewed the numbers in the years immediately preceding Gonzales's charge; that the methodologies used in the data offered by Gonzales in support of his motion were faulty in that the wrong population "pool" was targeted for comparisons as the number of charges brought against individuals of any one group must be compared not to the general population but only to those eligible to be charged; that aspects of the information sought by Gonzales were privileged or confidential and therefore not subject to disclosure; that Gonzales had offered nothing on the elements of other defendants "similarly situated" or who had engaged in "similar conduct" as these terms are used in section 745(a)(3) as he had not included any analysis of the perceived aggravated nature of his own conduct as factually compared to others similarly charged with a violation of section 148; that a misdemeanor charge such as a violation of section 148, which has no lesser included or lesser related offense and is itself the less serious charge compared to a

6

violation of section 69, cannot as a matter of law be the subject of a section 745(a)(3) violation, which requires establishing that the defendant suffered a "more serious" charge than similarly situated persons of other races who engaged in similar conduct; that generating all the requested data would be overly burdensome; and that for all these reasons, Gonzales had not made a good-cause showing for discovery supporting a violation of section 745(a)(3).

In sum, the People contended that Gonzales's deficient request for information based solely on his race and faulty statistical data and without any case-specific facts to establish a minimal and plausible factual foundation for such a violation was no more than a "fishing expedition based on mere speculation" and that the other *Alhambra* factors going in totality to a good cause showing likewise favored denial of the motion.

Notwithstanding the People's opposition to an order directing the requested disclosure, the People's papers referenced their offer to voluntarily provide a "de-identified list of all persons charged with violating [] section 148(a)(1) from January 1, 2017[,] to the present, along with the race/ethnicity and age of the person [at] the time of commission of the crime. Moreover, to the extent the People can reasonably do a data run[,] a de-identified … list of persons brought over [by law enforcement] for charging [but] who were not charged—along with the race/ethnicity and age of the person at the time of the commission of the crime."

Gonzales's reply below provided a superseding description of the records and data he sought and included additional materials and resources supporting historical racial inequities and disparate charging against Latinx people in Santa Clara County. His new description of data sought was: "1. All charges alleged by SJPD from the past five years for cases that include a [section] 148[, subdivision] (a)(1) charge including case numbers, names or a unique ID for the associated charged individuals, race, ethnicity, and/or national origin of individuals charged, gender and sex of individuals charged, and unredacted copies of the police

7

reports[,]" and "2. Complete Santa Clara County District Attorney case data for cases presented in the last five years (including, but not limited to, case number, complete charge list, case disposition, race, gender and sex of defendant, plea deals offered, prosecuting attorney, and charge level disposition) for all cases where the arresting agency alleges a [section] l48[, subdivision ](a)(l) charge, or the District Attorney files a [section] 148[, subdivision ](a)(1) charge."[5]

The new description of the data sought by Gonzales as articulated on reply was also supported by the declaration of Dylan Yep, who had received training in "statistics and computational policy analysis." Mr. Yep described his professional experience as including employment as a Senior Data Analyst in the San Francisco District Attorney's Office, where he was "responsible for developing criminal legal system data infrastructure and conducting analysis to identify disparities in policing, incarceration, and prosecution for the purpose of informing office policy." He had also worked as a "Data Journalist" analyzing "complex datasets to generate stories and assist non-technical journalists." Mr. Yep was asked to "assess whether there were racial/ethnic disparities in prosecutions in Santa Clara County for offenses covered by [section 148, subdivision (a)(1)] relative to the racial/ethnic composition of the Santa Clara County population as a whole."

Mr. Yep "reviewed a [PDO] dataset, which included all cases with a [section 148, subdivision (a)(1)] charge referred to the Santa Clara Public Defender's Office between January 1, 2018[,] and August 15, 2022. In addition, [he] reviewed the 2022 Race and Prosecutions report released by the Santa Clara District Attorney's Office." (Fn. omitted.) He concluded that the PDO "dataset reveals statistically significant racial disparities among Hispanic/Latinx individuals facing a [section 148, subdivision (a)(1)] charge. [¶] Hispanic/Latinx individuals account for 25.01%

_____

[5] It bears noting that the precise scope of Gonzales's discovery requests has evolved over the course of litigating his motion in the trial court and his petition in this court.

8

of the Santa Clara population, but 68% of [section 148, subdivision (a)(1)] charges were filed against a Hispanic/Latinx person, a percentage 2.7x higher than the Hispanic/Latinx population. [¶] In addition, Hispanic/Latinx individuals accounted for 51.7% of all Santa Clara [PDO] clients charged with a [section 148, subdivision (a)(1) charge, a percentage 2.1x higher than the Hispanic/Latinx population." In determining the statistical significance of these comparisons, Mr. Yep concluded that "*the likelihood of observing a difference this large or larger due purely to random chance is less than 0.001%.*" (Italics added, fn. omitted.) He further opined that there is "currently insufficient data to determine whether these disparities are as a result of racial bias in policing and/or prosecution, *but this result could reasonably be*" so. (Italics added.) But he also opined that "*[t]here is sufficient data to conclude that it is unlikely that these disparities are due to chance.*" (Italics added.)

Gonzales's arguments in reply emphasized the breadth of the uncodified legislative findings accompanying the RJA to overcome a narrow reading of section 745(a)(3) such that it can never be applied to charging decisions involving misdemeanors with no lesser included or lesser related offenses. And he underscored how the showing required for discovery under section 745(d) is intentionally and markedly lower at this first stage of the process of seeking RJA relief than at either the prima facie or evidentiary hearing stages. (See § 745, subd. (c).) He argued that the information he had identified and offered from available sources was sufficient in the totality to show a plausible factual foundation that a violation of section 745(a)(3) could or might have occurred when the DAO charged him with a violation of section 148, subdivision (a)(1) as opposed to "reviewing the case after arrest and releasing as a 'no-file,'" given the acknowledged historical and racial disparities in charging in Santa Clara County and how the requested information could bolster this claim. He further contended that an evaluation of the

9

other *Alhambra* factors favored disclosure and that protective means could be implemented to address any privacy or privilege concerns raised by the People.

The People then filed a "surrebuttal" in response. In it, they again challenged Gonzales's showing as failing to meet good cause for discovery for a potential violation of section 745(a)(3) as a matter of law in that a section 148, subdivision (a)(1) charge with no lesser included or lesser related offense cannot form the basis of such a violation. And they attacked the superseding description of the discovery sought as still overbroad and the methodologies of Dylan Yep's statistical conclusions as faulty. But they did "not dispute that the disproportionality between the number of Latinx individuals arrested or prosecuted for violations of [] section 148 as a percentage of the total number of persons arrested for that offense and the number of Latinx individuals as a percentage of the total number of Santa Clara County [residents] is unlikely to be due to random chance—regardless of which statistical measure of disparate impact is used." At the same time, they characterized even Mr. Yep as recognizing that "there is a distinction between drawing an inference that the disparity is not due to random chance and drawing an inference that the existence of disparity arises from bias based on group membership."

The People further offered by surrebuttal that even though it was not legally possible to establish a violation of section 745(a)(3) based on a theory that Gonzales as a Latinx person was charged with a section 148, subdivision (a)(1) violation whereas a similarly situated defendant of another race or ethnicity engaging in similar conduct would not have been charged at all, *if* he had been arrested or charged *because* he is Latinx whereas no arrest or charge would have occurred if he were not, "a plausible argument [could] be made" that this could constitute a violation of section 745(a)(1) by a law enforcement officer or a prosecutor "even if such conduct resulted from implicit bias or animus." The People also recognized that evidence "that similarly situated non[-]Latinx defendants who engaged in

10

similar conduct were not prosecuted for a violation of [] section 148 could be potentially relevant evidence to support" a section 745(a)(1) violation *if* Gonzales could "make the good cause showing," based on his case-specific facts.[6] But, they contended, such a showing was "even less substantial than" Gonzales's showing of a potential section 745(a)(3) violation because this threshold would require "facts of the instant case" that officers or prosecutors "exhibited bias or animus toward" him in arresting or charging him, as if implicit bias could only be exhibited or expressed by such case-specific facts.

In other words, the People at bottom contended that *more* than the fact of one's race or ethnicity and local statistics showing historical arrest or charging disparities by race or ethnicity are required to make a good cause showing for disclosure under section 745(d), and that case-specific facts supporting the asserted violation are *always* necessary to show good cause for disclosure regardless of which type of RJA violation is being asserted. As the People specifically argued, "there must be some evidence akin to the claim of pretextual stop [based on asserted racial profiling] in *Young* in conjunction with the other statistics that are being provided by the defense" to allow the disclosure request to rise to something beyond "just speculation" or a "fishing expedition."

At the motion hearing, Gonzales's counsel orally expanded the basis on which disclosure was sought to include a potential violation of section 745(a)(1), observing that a defendant seeking RJA disclosure need not specify or isolate the form of violation as listed in section 745, subdivisions (a)(1) though (a)(4). (See *Young, supra*, 79 Cal.App.5th at pp. 163–164.) And she emphasized the purposes of the RJA as demonstrated by its uncodified legislative findings as well as the low

---

[6] The People also offered to "voluntarily provide the number of persons (broken down along racial and ethnic grounds) brought over for charging and/or charged" to the extent they retained this information and their computer system was capable of producing it, notwithstanding their position that Gonzales had not made a showing of entitlement.

showing required for disclosure under the RJA, asserting that no "factual basis" of a particular violation was required at that "exploratory phase" over and above the general "inequities" and disparities as shown in the data and information already provided.

For their part, the People again acknowledged at the hearing that section 745(a)(1) would potentially apply if a "[prosecutor] in a particular case is not charging someone [but] charging someone else based on the respective race or ethnicity of these individuals." They further recognized that in this scenario, "some of the evidence that would be relevant to a [section] 745(a)(3) violation would also be relevant to a [section] 745(a)(1) violation." But then counsel pressed that the court "needs to make a determination, first, exactly what theory … the defense is proceeding on. Because what constitutes relevant evidence is going to be distinct [as] between a violation of [section] 745(a)(3) or … [section] 745(a)(1). You have to draw a distinction so you know what type of evidence should be provided."

Continuing, counsel for the People then argued that there were no facts beyond speculation in this case to suggest "any exhibition of bias, as required under [section] 745(a)(1)" while also acknowledging that the defense had no access to information as to individuals brought up by law enforcement for a charge of misdemeanor resisting arrest but not actually charged by the DAO, from which additional facts or conclusions about implicit racial bias in such decisions could be drawn. And counsel insisted that before getting such information, a defendant moving under the RJA had to make an "initial good cause showing"—something of Catch-22—that was lacking here even in the statistical evidence and data provided—because its methodology was faulty by not having used the "relevant pool for comparison" based not on the general population of the county but instead on those within the county who were eligible to be charged. Counsel characterized Gonzales's showing as consisting only of asserting that he was Hispanic and was

charged with a violation of section 148—an insufficient showing of an RJA violation and resting only on speculation.

The trial court appeared to accept the People's argument that some case-specific facts in addition to local statistics suggesting racial or ethnic disparity in charging are required to establish a plausible factual foundation for discovery under the RJA, whether the potential violation is under section 745(a)(1) or (a)(3). The court asked Gonzales's counsel, "[H]ow do I get there if there's not a good cause scintilla of something besides … the statistics you cite? Plus what, though? What else?" She responded that the " 'what else' " inquiry was misplaced and that Dylan Yep's declaration—opining that the racial disparities in the local statistics already offered "could be related to bias and policing and/or prosecution" and that there was "sufficient data to conclude … it is unlikely … these disparities are due to chance"—together with the other non-case-specific evidence offered amounted to "plausible justification" to require the requested disclosure by the prosecution. Defense counsel further noted that in *Young*, the only statistical data of racial disparities offered was statewide or out of county in scope, whereas the RJA requires such data to be by county, so that case-specific information—the "what else"—was needed in that instance. (See § 745(a)(3) & subd. (a)(4)(A) & (B).) She observed that evidence of racial profiling in the *Young* traffic stop was used to fill that evidentiary gap in specificity, but that such case-specific evidence was not required here because local statistics and data on racial disparities and inequities in the criminal justice system in Santa Clara County had been proffered to satisfy any needed specificity in the showing of a plausible justification.

The parties filed additional post-hearing submissions—from Gonzales a new study from the University of Wisconsin-Madison Department of Sociology. (See Professor Michael T. Light and Jungmyung Kim, *Racial Disparities in California Criminal History Data No.001: Charges of Resisting Arrest* (2024) <https://users.ssc.wisc.edu/~mlight/wp-

content/uploads/2024/07/Fact_Sheet_No.001.pdf> [as of Nov. 21, 2024].) It contained various data, including with breakdowns by county showing that "Santa Clara County has one of the largest racial gaps in the arrest rates of resisting arrest as well as stand-alone charges of resisting arrest. In fact, Santa Clara County is one of the top [five] most racially disparate count[ies]." The People's response to this supplemental exhibit attacked the validity and methodology of the new study and pointed out that the DAO's 2020 change in policy on charging stand-alone section 148 violations and other issues rendered the study meaningless here and even undermined Gonzales's position.

The trial court later denied Gonzales's motion in a lengthy written order. The court found that good cause had not been shown for a potential violation of section 745(a)(3)—the sole basis on which Gonzales's motion had initially been brought—because such a violation in the context of this case would ultimately require a showing that Gonzales had been charged with a "*more serious offense* than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions for *more serious offenses* against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained." (§ 745(a)(3), italics added.) Gonzales's initial theory behind his RJA discovery motion was that being charged with a violation of section 148, subdivision (a)(1) could qualify under section 745(a)(3) as being charged with a "more serious offense" when compared to similarly situated persons of other races engaging in similar conduct not being charged at all. The trial court rejected this theory as a matter of law on the plain language of section 745(a)(3), concluding that Gonzales having been charged with a stand-alone violation of section 148, subdivision (a)(1), a misdemeanor that is itself the less serious offense of resisting arrest as compared to section 69 and as to which there is no lesser included or lesser related offense, such a charge cannot logically

14

lend itself to a violation of section 745(a)(3). The court further concluded that in the absence of any case-specific facts bearing on the comparability of similarly situated defendants of other races engaging in similar conduct as Gonzales, the mostly statistical and general evidence of charging disparities in Santa Clara County he had presented in support of the motion fell short of establishing a plausible factual foundation based on specific facts to justify discovery under section 745(d). This was particularly so when, in the court's view, Gonzales's conduct as described in the police report was aggravated and he was the only one engaged in racial animus— towards the arresting officers—based on the facts so reported.

The trial court further briefly found that although a violation of section 745(a)(1)—not initially pursued in Gonzales's RJA discovery motion—could theoretically be shown by a prosecutorial decision to charge him with a violation of section 148, subdivision (a)(1) *because* he is Hispanic or Latinx, Gonzales's motion had still failed to establish a plausible factual foundation of such a violation based on specific facts as a threshold of good cause for the requested discovery under section 745(d). Section 745(a)(1) establishes a violation of the RJA when "[t]he judge, an attorney, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus toward the defendant because of the defendant's race, ethnicity, or national origin." On this, the court found that statistical evidence of charging disparities based on race, by itself, with no showing of any case-specific facts that an attorney or law enforcement officer here had "exhibited bias or animus towards [Gonzales] because of [his] race, ethnicity, or national origin" (§ 745(a)(1)), coupled with the perceived aggravated facts of this offense that included Gonzales himself expressing racial bias against the arresting officers, failed to advance a "plausible factual foundation, based on specific facts, that a violation of" section 745(a)(1) " 'could or might have occurred' in his case." (*Young, supra,* 79 Cal.App.5th at p. 159.) The court concluded that absent a case-specific plausible factual foundation in support of a potential section 745(a)(1)

15

violation, statistical evidence alone suggesting racial disparities in charging in Santa Clara County could not establish good cause for disclosure of the requested information.

B.     Appellate Division

Gonzales timely filed a petition for a writ of mandate challenging the court's denial order. On receipt of the petition, we requested and received preliminary opposition from the People, as real party in interest, and Gonzales filed a reply. We issued an order to show cause as to why Gonzales is not entitled to the requested relief and why a peremptory writ should not issue as prayed in the petition. The parties then elected to stand on their preliminary briefing as their return and traverse, respectively, as we had allowed.

We thereafter directed the parties to file supplemental briefing on the effect and application, if any, of *Mosby v. Superior Court* (2024) 99 Cal.App.5th 106 (*Mosby*), then newly filed by the Court of Appeal, on the issues presented in this case, which briefing we have considered. At oral argument, the parties informed us that they had negotiated further on the voluntary provision of responsive documents by the DAO. To define the scope of the issues before us, we later directed supplemental briefing on what documents or data within the scope of Gonzales's request remained outstanding and how that universe of information was still necessary for him to pursue his claim of an RJA violation. Based on that briefing, the scope of Gonzales's disclosure request remains: "(i) unredacted police reports; (ii) case numbers; (iii) plea deals offered; (iv) dispositions; (v) complete charge list; (vi) prosecuting attorney; and (vii) charge level disposition."

DISCUSSION

*I.     The Scope of the Proceeding and Issues Presented*

In his petition, Gonzales frames the issues presented as: (1) Did his motion present a plausible factual scenario such that it met the good cause requirements provided at section 745(d) and outlined in *Young, supra*, 79 Cal.App.5th 138?;

16

and (2) Is the RJA discovery provision at section 745(d) limited to only certain charges and does it correctly exclude information leading to a comparison of conduct that results in the filing of a case versus conduct that results in the rejection of a case? The petition's main focus is a potential violation of section 745(a)(3) but it includes argument as to a section 745(a)(1) violation as well.

Gonzales principally contends that contrary to what the trial court determined, section 745(a)(3) does not inherently exclude cases such as his where only a misdemeanor offense with no "lesser included" or "lesser related" offense is charged (on the theory that being charged with such a crime qualifies as being charged with a "more serious offense" than not being charged at all). He further contends that even without a presentation of the specific facts constituting the alleged crime or comparing his conduct to that in other cases, and based solely on statistical data, he presented a plausible factual scenario, meeting the good cause requirement of section 745(d) as explained in *Young, supra,* 79 Cal.App.5th 138 to warrant production by the DAO of the requested data.

The People retort that: (1) because there is "no less serious offense with which [Gonzales] could have been charged … section 745(a)(3), which seeks to prevent defendants from unfairly being charged with *more serious* offenses based on group membership, is inapplicable to [Gonzales]'s allegation"; (2) Gonzales has not established "good cause to believe relevant evidence exists that would show a violation of" section 745, subdivision (a)(1) or (a)(3), because the statistical information proffered by Gonzales in support of his motion is not from a relevant population; and (3) "even assuming [Gonzales] has shown a plausible justification to order the discovery, other factors that weigh in the good cause analysis skew heavily against a finding of good cause in the instant case."

As we see it, the questions before us—the threshold for establishing a plausible factual scenario for discovery under section 745(d) and whether Gonzales met that—is initially one of statutory interpretation. " 'We review

statutory interpretation questions de novo.' (*Ventura County Deputy Sheriffs' Association v. County of Ventura* (2021) 61 Cal.App.5th 585, 590.)" (*Mosby, supra,* 99 Cal.App.5th at p. 122.) " ' "When we interpret a statute, '[o]ur fundamental task … is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. … If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' (*City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616–617, quoting *Sierra Club v. Superior Court* (2013) 57 Cal.4th 157, 165–166.)" (*Brennon B. v. Superior Court* (2022) 13 Cal.5th 662, 673.) " ' " Ultimately[,] we choose the construction that comports most closely with the apparent intent of the lawmakers, with a view to promoting rather than defeating the general purpose of the statute. [Citations.]" ' (*Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.)" (*People v. Tan* (2021) 68 Cal.App.5th 1, 5.)

But we conclude that, notwithstanding the parties' framing of the issues, at this juncture, to resolve the questions before us, we need not definitively decide or isolate which particular kind of RJA violation as set out at section 745(a)(1) or (a)(3) may potentially be established or ruled out in this case. The question is more generally whether Gonzales established a plausible factual foundation for any potential violation of the RJA as the threshold of a showing of good cause.

18

*II.    The RJA*

"Effective January 1, 2021, the [RJA], which is codified in a scheme of interrelated statutes in the Penal Code (§§ 745, 1473, subd. (f), 1473.7, subd. (a)(3)), states that '[t]he state shall not seek or obtain a criminal conviction or seek, obtain, or impose a sentence on the basis of race, ethnicity, or national origin.' (§ 745, subd. (a).) The command is simple, but the implementation is somewhat complex." (*Young, supra,* 79 Cal.App.5th at p. 147.)

The Legislature enacted the RJA "with the express intent 'to eliminate racial bias from California's criminal justice system' and 'to ensure that race plays no role at all in seeking or obtaining convictions or in sentencing.' [Citations.] Its goal is to 'provide remedies that will eliminate racially discriminatory practices in the criminal justice system, in addition to intentional discrimination. [Citation.]" (*Mosby, supra*, 99 Cal.App.5th at p. 123.) "Section 745 was enacted, in part, to address *McCleskey v. Kemp* (1987) 481 U.S. 279, 295– 299, which found that there was 'a discrepancy that appears to correlate with race' in death penalty cases in Georgia, but the court would not intervene without proof of a discriminatory purpose, concluding that we must simply accept these disparities as 'an inevitable part of our criminal justice system.' " (*Mosby, supra*, 99 Cal.App.5th at p. 123.)

"Accompanying the [RJA] is a set of uncodified findings that comment extensively on the state of the law at the time the Act was passed." (*Young, supra*, 79 Cal.App.5th at p. 149.) "Stating its intent to depart from the discriminatory purpose paradigm in federal equal protection law," as expressed in *McCleskey* and other cases, in the RJA findings, "the Legislature declares an objective 'to reject the conclusion that racial disparities within our criminal justice [system] are inevitable, and to actively work to eradicate them.' [Citation.]" (*Id.* at p. 150.) The expressed purpose and scope of the RJA to provide broader relief for racial discrimination in the criminal justice system than is

available under federal equal protection principles extends to providing a defendant access to information, including statistical data, with which to pursue relief. With respect to the discovery provision at section 745(d), the RJA legislative findings express the goal to " 'ensure' that defendants claiming a violation of section 745, subdivision (a) have 'access to all relevant evidence, including statistical evidence, regarding potential discrimination in seeking or obtaining convictions or imposing sentences.' [Citation.]"[7] (*Ibid.*) "Because uncodified findings of legislative intent are voted on by the entire legislative body, enrolled and signed by the Governor, they may be entitled to somewhat greater weight than traditional legislative history materials … . [Citation.]" (*Id.* at p. 157.) And "[g]iven the specificity of the findings accompanying the [RJA]," the *Young* court determined to give the detailed statement of legislative intent accompanying the RJA "considerable weight." (*Ibid.*)

"The Act sets forth four categories of conduct, any of which, if proved, is enough to 'establish' a violation of section 745, subdivision (a)." (*Young, supra,* 79 Cal.App.5th at p. 147.) Relevant here as a potential basis of an RJA violation is section 745(a)(1) where: "The judge, an attorney in the case, a law enforcement officer involved in the case, an expert witness, or juror exhibited bias or animus towards the defendant because of the defendant's race, ethnicity, or national origin." Also relevant here as a potential basis of an RJA violation is section 745(a)(3) where: "The defendant was charged [with] or convicted of a more serious offense than defendants of other races, ethnicities, or national origins who have engaged in similar conduct and are similarly situated, and the evidence establishes that the prosecution more frequently sought or obtained convictions

_____

[7] Moreover, section 745 specifically allows the court to consider statistical evidence and aggregated data in the determination whether a violation of the RJA has occurred. (§ 745, subd. (c)(1); see also § 745, subd. (h)(1) [statistical evidence and aggregate data may be used to show racial disparities in seeking or obtaining convictions or in imposing sentences].)

for more serious offenses against people who share the defendant's race, ethnicity, or national origin in the county where the convictions were sought or obtained."[8]

"Procedurally, the [RJA] authorizes defendants to seek relief for a violation of section 745, subdivision (a), prior to imposition of judgment, by 'motion … in the trial court.' (§ 745, subd. (c).) If such a motion is brought, the court shall, upon a showing of a prima facie violation of section 745, subdivision (a), hold a hearing at which 'evidence may be presented by either party, including, but not limited to, statistical evidence, aggregate data, expert testimony, and the sworn testimony of witnesses'; the court may appoint an independent expert; and the defendant shall bear the burden of proof of a violation of section 745, subdivision (a) by a preponderance of the evidence. (§ 745, subd. (c).) At the conclusion of the hearing, 'the court shall make findings on the record.' (§ 745, subd. (c)(3).) And if

_____

[8] Section 745, subdivision (h)(6) defines "similarly situated." " 'Similarly situated' means that factors that are relevant in charging and sentencing are similar and do not require that all individuals in the comparison group are identical. A defendant's conviction history may be a relevant factor to the severity of the charges, convictions, or sentences. If it is a relevant factor and the defense produces evidence that the conviction history may have been impacted by racial profiling or historical patterns of racially biased policing, the court shall consider the evidence." (§ 745, subd. (h)(6).)

Section 745, subdivision (h)(1) defines "more frequently sought or obtained" to mean "that the totality of the evidence demonstrates a significant difference in seeking or obtaining convictions or in imposing sentences comparing individuals who have engaged in similar conduct and are similarly situated, and the prosecution cannot establish race-neutral reasons for the disparity. The evidence may include statistical evidence, aggregate data, or nonstatistical evidence. Statistical significance is a factor the court may consider, but is not necessary to establish a significant difference. In evaluating the totality of the evidence, the court shall consider whether systemic and institutional racial bias, racial profiling, and historical patterns of racially biased policing and prosecution may have contributed to, or caused differences observed in, the data or impacted the availability of data overall. Race-neutral reasons shall be relevant factors to charges, convictions, and sentences that are not influenced by implicit, systemic, or institutional bias based on race, ethnicity, or national origin."

a violation of section 745, subdivision (a) is proved, 'the court shall impose a remedy specific to the violation found from the following list' (§ 745, subd. (e)): declaration of a mistrial, discharge of the jury and empanelment of a new jury; or dismissal of enhancements, special circumstance allegations, or other special allegations; or reduction of one or more charges. (§ 745, subd. (e)(1)(A)–(C).)"[9] (*Young, supra,* 79 Cal.App.5th at p. 148.)

---

[9] We note that the specified remedy provision of the RJA at section 745(e)(1) for cases in a pre-judgment posture does not provide for dismissal of charges, regardless of the form of the violation. And, as relevant here, it is unclear whether the available pre-judgment remedy of "reduc[ing] one or more charges" (§ 745, subd. (e)(1)(c)) could include modification of a charge such as a section 148 violation that technically has no lesser included or lesser related offense. But we find it anomalous that the Legislature would have intended to provide no remedy even for a pre-judgment RJA violation based on section 745(a)(1) just because the charge at issue is a misdemeanor charged at the lowest level. We further note that the specified post-judgment remedies for an RJA violation specifically include that "[i]f the court finds that the only violation of subdivision (a) that occurred is based on paragraph (3) of subdivision (a), the court may modify the judgment to a lesser included or lesser related offense." (§ 745, subd. (e)(2)(A).) We also observe that section 745(e)(4) provides that the "remedies available under this section do not foreclose any other remedies available under the United States Constitution, the California Constitution, or any other law." How this provision interacts with the introductory directive at section 745(e) that if an RJA violation is found, "the court *shall* impose a remedy specific to the violation found *from the following list*" (italics added) is an open question.

We raise these issues of the available remedies under the RJA here just to flag them. But these remedial questions are not directly before us in this case at the juncture of a motion for disclosure under section 745(d), as they would come into play only later "if the court finds, by a preponderance of evidence, a violation of subdivision (a)"—meaning after a prima facie showing and an evidentiary hearing where the evidentiary burdens on a defendant are escalating at each stage. While the trial court here addressed whether a section 148 charge—having no lesser included or lesser related offense—may ever be the subject of a section 745(a)(3) violation as a matter of law, it did not do so in terms of the available remedies specified under the RJA. And the parties have not raised or briefed these issues; we therefore perceive them for another day.

*III.* *Discovery Disclosures Under the RJA*

The RJA discovery provision, section 745(d), states, in relevant part: "A defendant may file a motion requesting disclosure to the defense of all evidence relevant to a *potential violation* of subdivision (a) in the possession or control of the state. A motion filed under this section shall describe the type of records or information the defendant seeks. Upon a showing of good cause, the court shall order the records to be released." (Italics added.) "Good cause" is not defined.

Currently, *Young* is the only published authority that fully addresses the standard for discovery under section 745(d). The *Young* court observed that " ' "[t]he term 'good cause' is not susceptible of precise definition." ' [Citation.] This chameleon-like phrase takes on different meanings in different contexts." (*Young, supra*, 79 Cal.App.5th at p. 158.) *Young* discussed what must be shown to establish good cause for disclosure in this context: "Borrowing from the minimal threshold showing that is required to trigger an obligation to provide so-called *Pitchess* discovery (Evid. Code, § 1043, subd. (b); see *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 [(*Pitchess*)]), we hold that Young may claim entitlement to discovery under section 745[(d)] if he makes a plausible case, based on specific facts, that any of the four enumerated violations of section 745, subdivision (a) could or might have occurred. (§ 745, subd. (a)(1)–(4).)" (*Young, supra,* 79 Cal.App.5th at p. 144.)

But, under the RJA, "a showing of plausible justification is merely a threshold consideration [of the good cause standard]. 'The trial court, in deciding whether the defendant shall be permitted to obtain discovery of the requested material, must consider and balance a number of [other] factors' ([*Alhambra, supra,*] 205 Cal.App.3d [at p.] 1134), '[s]pecifically … (1) whether the material requested is adequately described, (2) whether the requested material is reasonably available to the governmental entity from which it is sought (and not readily available to the defendant from other sources), (3) whether production of

23

the records containing the requested information would violate (i) third party confidentiality or privacy rights or (ii) any protected governmental interest, (4) whether the defendant has acted in a timely manner, (5) whether the time required to produce the requested information will necessitate an unreasonable delay of defendant's trial, [and] (6) whether the production of the records containing the requested information would place an unreasonable burden on the governmental entity involved' (*ibid.*, fns. omitted)." (*Young, supra,* 79 Cal.App.5th at pp. 144–145.)

The *Young* court elaborated that this standard for discovery is "similar to the threshold showing that must be made for *Pitchess* discovery, [but] it is in some respects even more relaxed than the 'relatively relaxed standard[]' under Evidence Code section 1043, subdivision (b). (*City of Santa Cruz v. Municipal Court* [(1989) 49 Cal.3d [74,] 84.) Good cause for *Pitchess* purposes must be supported by an affidavit setting forth a reasonable belief that the requested discovery is material to the subject matter of the case. The *Pitchess* materiality requirement also places a burden on the movant to 'propose a defense or defenses to the pending charges' and a 'logical link between the defense proposed and the pending charge.' (*Warrick* [*v. Superior Court* (2005)] 35 Cal.4th [1011,] 1024, 1021.) There is no comparable affidavit requirement for a discovery motion under section 745[(d)]. And there is no materiality requirement, at least not in the sense that the defendant must show a 'logical link' between some defense and a pending charge." (*Young, supra,* 79 Cal.App.5th at pp. 159–160, fn. omitted.) And like with *Pitchess* discovery, a defendant seeking disclosure under the RJA need not " 'present a credible or believable factual account of, or motive for,' " the violation, where the trial court weighs or assesses the evidence. (*Id.* at p. 159.) At this juncture, " '[t]he trial court does not determine whether a defendant's version of events, with or without corroborating collateral evidence, is persuasive … .' " (*Ibid.*)

Further, under the RJA, a defendant moving for disclosure need not isolate the asserted basis for the potential violation under section 745, subdivision (a) to show a plausible factual foundation—a claim the People make here, as they also did in *Young*. The *Young* court rejected this parsing requirement for the showing needed for RJA disclosure. "The four numbered subparts within section 745, subdivision (a) do not describe independent 'violations' of the statute. Rather, they describe different means of proving that the state exercised its criminal sanctions power 'on the basis of race, ethnicity, or national origin' in violation of section 745, subdivision (a). … Collectively, these subparts allow a defendant to proceed by direct evidence of discriminatory intent (i.e., an exhibition of 'bias or animus' or use of 'racially discriminatory language' (§ 745, subd. (a)(1)–(2)) or by proof of racial bias against a group of which defendant is a member based on harsher treatment of this group vis-à-vis others of a different race (§ 745, subd. (a)(3)–(4)). Within this broad scheme, which covers every stage of the prosecutorial process—from investigation through charging, trial, conviction, and sentencing—defendants may pursue different theories supported by different kinds of proof. What the [People] overlook[] is that the evidence offered in support of a theory of violation under one subpart may be corroborative of the evidence supporting another theory of violation under a different subpart. In short, as we read them, subdivision (a), subparts (1) and (3) are not isolated pathways to proving a violation, but in a given case—this one being an example—may work in tandem." (*Young, supra*, 79 Cal.App.5th at pp. 163–164; see also *Bonds v. Superior Court* (2024) 99 Cal.App.5th 821, 830–831 [RJA specifically provides that reliable, statistical evidence and aggregated data are admissible to show whether a violation has occurred and section 745, subd. (c)(1) makes no distinction between the various subparts of subdivision (a), so there is no basis to say that such evidence is admissible only to show certain types of violations and not others].)

Along this line, the *Young* court further concluded: "In arguing that evidence pertaining to a theory under subdivision (a)(1) has no bearing on a theory under subdivision (a)(3), the [People] fail[] to appreciate how evidence of racial bias in arrests may be potentially relevant to an allegation of racial bias in charging." (*Id.* at p. 164.) On this logic, the *Young* court rejected the People's argument there that evidence of racial bias in a traffic stop could not justify discovery pertaining to the prosecution's charging decisions and that there was no " 'logical link' between the claimed evidence of racial profiling and the request for discovery of the charging statistics." (*Ibid.*) The court recognized that "each element of discretionary decisionmaking must be taken into account in interpreting" the aggregate statistics under the RJA. (*Id.* at p. 165.) "Applying that logic to this case, if—as Young alleges—there is facial discrimination by Solano County police officers in arresting people" for a particular charge, "that *may* be reflected in downstream decisions by the district attorney concerning whom to charge." (*Ibid.*)

All that said, the scope of permissible discovery under the RJA is not boundless. "The limiting factor [of the good cause standard] is 'relevance' in the discovery sense—that is, each request for disclosure must be reasonably calculated to lead to discovery of admissible evidence probative of a section 745, subdivision (a) violation. This subject matter limitation on the scope of discoverable material creates an outer boundary that, if crossed, may justify an order narrowing or otherwise limiting the obligation to respond. And as always in the context of discovery, the trial court has ample discretion to manage where the discovery-relevance boundary lies." (*Young, supra,* 79 Cal.App.5th at p. 160.) Thus, the degree of relevance of the information sought and its outer bounds can be addressed in the scope of the discovery allowed while not precluding all access to information on this basis.

Also relevant to our assessment and interpretation of the good cause standard for RJA disclosure is the recognition that section 745 contemplates escalating evidentiary burdens on a defendant seeking relief at the various stages of the process. A good cause showing is required for discovery, the burden at the prima facie stage is higher, and the burden on the defendant at the evidentiary hearing is higher still—proof of an RJA violation by a preponderance of the evidence. (§ 745, subds. (c) & (d).) So, what is required for a prima facie showing informs what is required for the lesser showing of good cause to obtain discovery.

In this regard, *Mosby* is instructive. There, the majority concluded that given the defendant's ultimate showing of a violation of section 745(a)(3) at the prima facie stage, which included statistical evidence of racial charging disparities as compared to the general population of Riverside County and case-specific facts from his and other cases involving charges of murder with gun enhancements and prior convictions and the pursuit of the death penalty, the court did not need to "determine based on the evidence presented whether only statistical evidence" of disparate charging would be enough under section 745, subdivision (c) for a prima facie showing entitling the defendant to an evidentiary hearing. (*Mosby, supra*, 99 Cal.App.5th at p. 113.)

But the separately concurring justice noted that Mosby's statistical evidence "included regression analyses" highlighting the disparities after controlling for legally relevant factors. (*Mosby, supra,* 99 Cal.App.5th at p. 133 (conc. opn. of Menetrez, J.).) And he concluded that "statistical evidence can be sufficient on its own to make a prima facie case of a violation of the RJA." (*Id.* at p. 134 (conc. opn. of Menetrez, J.).) The concurrence further noted that the "relationship between the RJA and *McCleskey*[, *supra,*] 481 U.S. 279 shows that the trial court's ruling—that statistical evidence cannot be sufficient to make a prima facie case—cannot be correct." (*Id.* at p. 135 (conc. opn. of Menetrez, J.).) The concurrence further observed that other "aspects of the statutory language

27

support" this conclusion, including that to make a prima facie case under the RJA, a "defendant need only show that there is 'more than a mere possibility' that subdivision (a) of section 745 has been violated. (§ 745, subd. (h)(2); see also *Finley v. Superior Court* (2023) 95 Cal.App.5th 12, 21–22 [discussing the standard for a prima facie case under the RJA, which is lower than the prima facie standard for writs of habeas corpus].)" (*Mosby, supra*, 99 Cal.App.5th at p. 136 (conc. opn. of Menetrez, J.).) Finally, the *Mosby* concurrence observed that "[s]tatistical techniques such as regression analysis can show that racial disparities exist even when one controls for various relevant characteristics, meaning that racial disparities exist among defendants who are similarly situated (i.e., defendants who share those relevant characteristics). The statute's reference to defendants who are 'similarly situated' thus does not mean that a defendant must prove, at the prima facie stage, that there is at least one other defendant who is *identical* except for race and has an *identical* case except for race but who was treated less harshly." (*Id.* at p. 137 (conc. opn. of Menetrez, J.).)

It stands to reason that if the higher prima facie burden under the RJA can be met with statistical evidence alone, then the lower good cause showing required for disclosure under section 745(d) does not necessarily require comparative case-specific factors from the defendant's and other cases—the "what else"—as the trial court seemed to require here for Gonzales to meet the threshold plausible factual foundation. Moreover, as argued by Gonzales but seemingly rejected by the trial court, while the defendant in *Young* included some evidence of racial profiling in his case in addition to statewide and out-of-county statistics showing charging disparities along racial lines, the *Young* court did *not* set both as a requirement for a plausible factual foundation or a good cause showing. Instead, it is logical to conclude that the racial profiling evidence there was needed to provide the "specific facts" relating to a potential RJA violation as part of a plausible factual foundation because the statistical evidence showing

28

disparities offered in that case was only statewide and out of county, not generated at the local, county level. (*Young, supra*, 79 Cal.App.5th at p. 144.) Here, in contrast, Gonzales has offered local county data that, in itself, can provide the "specific facts" required for a "plausible case" for RJA discovery. (*Ibid.*) Case-specific facts either of the defendant or others are not necessarily required to make the showing.

<blockquote>
IV.    *Gonzales Has Shown a Plausible Factual Foundation That a Violation of Section 745, Subdivision (a) Could or Might Have Occurred in his Case*
</blockquote>

Gonzales's showing for RJA discovery consisted of the following: (1) he is Latinx; (2) he has been charged with violating section 148, subdivision (a)(1); (3) according to the July 2021 United States Census, the population of Santa Clara County is 25 percent Latinx; (4) according to the People's own data from the DAO's "Race and Prosecutions Report: 2022 Update," 68 percent of those charged with violating section 148, subdivision (a)(1), are Latinx; (5) internal and historical PDO data suggests some similar racial disparities or disparate impacts in the prosecution of charges for resisting arrest in Santa Clara County; and (6) Dylan Yep's opinion that these overall statistical disparities are likely not due to chance and could reasonably be attributed to bias in policing and/or prosecution but the state of the data is currently insufficient to conduct deeper statistical analysis with which to draw further conclusions.

The question before us is whether this showing, in the totality, established a plausible factual foundation, based on specific facts, that *any* of the enumerated violations of section 745, subdivision (a) could or might have occurred. We conclude based on the low showing required that it did—even without case-specific facts from this case as compared to those of others—and that a weighing and balancing of the remaining *Alhambra* factors in the exercise of the trial court's discretion was necessary to determine whether good cause was shown for scoped disclosure tailored by application of those factors.

*Young* supports this conclusion. There, as noted, defendant Young provided statewide statistical data and data from another county about car stops. Although the court "decline[d] to decide whether Young ha[d] shown good cause for the disclosures he request[ed,]" it observed the following about his statistical offerings: "To be sure, we agree with the Attorney General that the statistical proof Young puts forward does not make out a particularly strong case of racial profiling. Young's argument based on statewide data and data from another county not only fails to focus directly on Solano County, but [it] lacks any of the statistical controls that persuaded the courts in [*State v.*] *Kennedy* [(1991) 247 S.J. Supper. 21] and *State v. Ballard* [(2000) 331 N.J. Super. 529] to credit the profiling claims made in those cases. From that unimpressive foundation, he draws the inference that the Solano County District Attorney's charging practices are tainted with racial bias. The flaws in Young's statistical proof, however, serve to illustrate how the good cause standard works. *At this stage, he need not make a strong case but only a plausible one.* Here, his claim that he was closely observed before being pulled over and subjected to excessive force in the course of his arrest arguably tips the scale from a situation in which he is speculating about possible racial profiling to one in which, in his case, specific facts arguably provide circumstantial proof of the substance of the allegation.[] Statistical discovery could bolster this claim and rationally tie it to prosecutorial decisionmaking, at least as a prima facie matter." (Young, *supra,* 79 Cal.App.5th at p. 166, italics added, fn. omitted.)

While the defendant in Young did present some evidence of racial profiling in his case, that evidence was not perceived as strong and it served to complement the statewide and out-of-county—and thus non-specific—statistics of racial disparities in charging he had offered. This was, in totality, viewed by the Court of Appeal as meeting in that case the plausible foundation based on specific facts required for discovery under the RJA. But the court did *not* define such a

showing as requiring both statistics and case-specific facts in every case. Indeed, the standard must be flexible to serve the RJA's broad and express purposes. We therefore reject the trial court's conclusion here that case-specific facts—the "what else"—was required.

Nor, as we have observed, did the court in *Young* require a defendant to pursue and establish good cause for a particular type of RJA violation as enumerated in section 745, subdivision (a). In fact, and as noted, the court expressly rejected this approach. (*Young, supra*, 79 Cal.App.5th at pp. 163–164.) It's clear that if Gonzales were arrested or charged with resisting arrest because he is Latinx whereas others who were similarly situated and who engaged in similar conduct but who belong to a different group were not so arrested or charged based on that membership, even based on implicit bias, then that would conceivably constitute a violation of section 745(a)(1)—perhaps in addition to a violation of section 745(a)(3). The People concede this point. Because of this, we need not drill further down into the required proof for separate kinds of RJA violations or determine at this juncture whether, as a matter of law, a violation of section 745(a)(3) cannot occur with a misdemeanor charge that has no lesser included or lesser related offense. The same information sought by Gonzales to show a potential section 745(a)(3) violation may well corroborate—or dispel—a potential violation of section 745(a)(1). For this reason, we likewise reject the trial court's reasoning that because Gonzales may not legally pursue a potential violation of section 745(a)(3), he did not and could not meet the threshold of a plausible factual foundation for disclosure.

Notwithstanding the People's concession that evidence of one type of RJA violation may be corroborative of another, they insist that case-specific facts are required to establish the showing for discovery of any kind of RJA violation and that Gonzales's lack of engagement with such facts in his case imperiled his entitlement to disclosure under section 745(d). The trial court appeared to agree.

But we view the local, county-level data and statistics offered here in totality as sufficient to meet the specificity requirement for a plausible factual foundation. The showing is surely not strong, as in *Young*, to establish a prima facie case, and more will be required at that stage. But it is more than simply membership in a certain racial or ethnic group and having been charged with resisting arrest. Moreover, the People's attacks on the methodologies used in the data and statistics offered for discovery or their claimed overbreadth will need to be countered when the burden is higher at later stages. But, at this disclosure stage, Gonzales has proffered enough to meet the low threshold of a plausible factual foundation that an RJA violation could or might have occurred in his case. And to the extent the parties argue the merits of the other *Alhambra* factors in the ultimate good-cause determination, which the trial court did not here address, the scope and limits of discovery that might be allowed can be tailored to address those concerns.

The *Young* court's discussion on requiring more proof of a violation to obtain discovery is helpful to Gonzales's argument here. "In essence, the Attorney General invites us to take the same approach under the [RJA] that the [*United States v.*] *Armstrong* [(1996) 517 U.S. 456] court took in the equal protection context by making it a precondition to discovery that Young make some showing [that] others of a different race were treated more leniently than he was treated. We decline to do so. … Preventing a defendant from obtaining information about charging decisions without first presenting that same evidence in a discovery motion is the type of a catch-22 the Act was designed to eliminate. [¶] …While the *Armstrong* court was focused on creating a discovery-triggering standard in the equal protection setting that was high enough to minimize the potential for insubstantial claims, thereby saving prosecutors from the distraction of responding to them [citation]—a concern that echoes the floodgates argument derided by Justice Brennan in *McCleskey*[, *supra,* 481 U.S. 279]—it appears to us

that in section 745[(d)], our Legislature had a different priority. The Legislature was focused, instead, on creating a discovery-triggering standard that is low enough to *facilitate potentially substantial claims*, even if it came at some cost to prosecutorial time and resources." (*Young, supra,* 79 Cal.App.5th at pp. 162–163.)

The evidence offered by Gonzales is sufficient to fulfill his obligation to show a plausible factual foundation in support of good cause at this phase. As Gonzales and the *Young* court note, he cannot make a more specific demonstration of any kind of RJA violation without the discovery he seeks from the People. Insisting upon such a showing at this juncture is circular. Instead, where the statistical evidence Gonzales has presented supports an inference that Latinx people may have been disproportionately charged with resisting arrest and that non-Latinx people who were similarly situated by engaging in similar conduct were treated more leniently by not being so charged, this is sufficient to show that an RJA violation could or might have occurred.

DISPOSITION

Gonzales's petition is granted. Let a writ of mandate issue directing respondent superior court to vacate its order denying Gonzales's motion for disclosure under section 745(d) and to conduct a new hearing and exercise its discretion by weighing and balancing the remaining *Alhambra* factors in the determination whether good cause for discovery has been shown and any appropriate scope of discovery allowed. The matter is remanded to the trial court for this purpose. The trial court is ordered to review the specific discovery requests made by Gonzales, in their latest iteration, and rule on the requested material consistently with the *Alhambra* factors described in *Young, supra,* 79 Cal.App.5th at pages 144–145. Gonzales's requests are furthermore subject to "[t]he limiting factor [of] … 'relevance' in the discovery sense—that is, each request for disclosure must be reasonably calculated to lead to discovery of

33

admissible evidence probative of a section 745, subdivision (a) violation." (*Young, supra,* 79 Cal.App.5th at p. 160.)

_____

Williams, P.J.

WE CONCUR:

_____

Kuhnle, J.

_____

Chung, J.

Filed 12/16/24

**CERTIFIED FOR PUBLICATION**

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SANTA CLARA**

**APPELLATE DIVISION**

| | |
|---|---|
| ISAAC GABRIEL GONZALES, | No. 23AP002906 |
|     Defendant and Petitioner, | Trial Ct. No. C2215191 |
| v. | |
| SUPERIOR COURT OF SANTA CLARA COUNTY, (Limited Jurisdiction), | ORDER MODIFYING OPINION, GRANTING REQUESTS FOR PUBLICATION, AND CERTIFYING OPINION FOR PUBLICATION |
|     Respondent, | |
| THE PEOPLE, | NO CHANGE IN JUDGMENT |
|     Real Party in Interest. | |

BY THE COURT:

It is ordered that the opinion filed on November 21, 2024, be modified as follows:

1. In the first full paragraph on page 8 that begins with "The new description", at the end of that first sentence, add as footnote 6 the following footnote, which will require renumbering of all subsequent footnotes:

6 There was no objection to this new evidence coming on reply and both sides, as well as the trial court, appeared to accept it as properly before the court.

2. In the first full paragraph on page 11, beginning with "In other words," in that first sentence, replace the word "are" appearing between the words "ethnicity" and "required" with the word "is" so that the phrase reads "by race or ethnicity is required to make a good cause showing".

3. In the last paragraph on page 12 that begins with "Continuing", in the second sentence of that paragraph beginning with "And counsel", delete the capitalization of the word "Catch-22" so that the word reads "catch-22".

4. On page 14, in the paragraph that begins on the preceding page, in the second sentence beginning with "It contained", add the words "as interpreted" surrounded by commas in between the words "that" and " 'Santa" so that this sentence reads:

It contained various data, including with breakdowns by county showing that, as interpreted, "Santa Clara County has one of the largest racial gaps in the arrest rates of resisting arrest as well as stand-alone charges of resisting arrest. …"

5. At the bottom of page 15, in the last paragraph on that page, at the end of the third sentence that begins with "On this," which end of sentence reads "in his case.' " followed by the citation, delete the end of the sentence and the citation and replace them with the following so that the end of the sentence reads:

" 'could or might have occurred' in his case," citing *Young, supra*, 79 Cal.App.5th at page 159.

2

6. At the bottom of page 16, after the DISCUSSION subheading "*I. The Scope of the Proceeding and Issues Presented*", add a new first paragraph before the existing one that begins with "In his petition," so that the new first paragraph after this subheading reads:

"Writ review is appropriate in discovery matters where, as here, it is necessary to address 'questions of first impression that are of general importance to the trial courts and to the [legal] profession, and where general guidelines can be laid down for future cases.' [Citation.]" (*People v. Superior Court (Cheek)* (2001) 94 Cal.App.4th 980, 987 (*Cheek*).)

7. Additionally, in the last sentence at the existing first paragraph (now second) after the same subheading on page 16 "*I. The Scope of the Proceeding and Issues Presented*", add a comma after "section 745(a)(3)" so that this last sentence of the paragraph, which appears at the top of page 17 of the opinion, reads:

The petition's main focus is a potential violation of section 745(a)(3), but it includes argument as to a section 745(a)(1) violation as well.

8. At page 18, add a new paragraph before the existing last full paragraph on that page that begins with "But we conclude", with the new paragraph reading:

Generally, "[t]he standard of review for a discovery order is abuse of discretion, because management of discovery lies within the sound discretion of the trial court. [Citation.]" (*Cheek, supra*, 94 Cal.App.4th at p. 987.) Judicial discretion to grant or deny a discovery order " 'is not unfettered. The scope of discretion always resides in the particular law being applied by the court, i.e., in the " 'legal principles governing the subject of [the] action … .' " ' [Citation.] Thus, 'we consider whether the trial court's exercise of discretion is consistent with the statute's intended purpose.' [Citation.] " 'If the court's decision is influenced by an erroneous understanding of applicable law or reflects an unawareness of the full scope of its discretion, the court has not properly exercised its discretion under the law. [Citation.] Therefore, a discretionary order based on an application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion and is subject to reversal. [Citation.]' [Citation.] The question of whether a trial court applied the correct legal standard to an issue in exercising its discretion is a question of law [citation] requiring de novo review [citation].' [Citation.]" (*In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 116.)

9. In the existing paragraph at the bottom of page 18 that begins with "But we conclude", delete the word "But" and capitalize "We" so that the beginning of the paragraph and sentence reads "We conclude".

10. In the same paragraph on page 18 that now begins with "But we conclude", in the second and last sentence that begins with "The question", add the word "dispositive" between these two words so that the second and last sentence of this paragraph begins with "The dispositive question".

11. On page 19, in the second full paragraph beginning with "The Legislature", in the second sentence that begins with the quotation "Section 745 was enacted …", at the end of the citation to *McCleskey v. Kemp* (1987) 481 U.S. 279, 295–299," appearing within the quote, add the abbreviation "[(*McCleskey*)]" so that the full citation within the quote reads:

*McCleskey v. Kemp* (1987) 481 U.S. 279, 295–299 [(*McCleskey*)],

12. Within the second paragraph of existing footnote 9 at page 22, after the second sentence of this paragraph, which sentence ends with "at each stage." and before the next sentence beginning with "While", add the citation "(§ 745, subd. (e).)" between these two sentences.

13. On page 25, delete the first sentence of the sole paragraph on this page and replace it with the following sentence:

Further, under the RJA, a defendant moving for disclosure need not isolate the asserted basis for the potential violation under section 745, subdivision (a) to show a plausible factual foundation—counter to what the People claim here and as they likewise claimed in *Young*.

14. On page 26, after the first full sentence of the first paragraph that begins with "Along this line", delete the citation to "*Id.*" after this sentence and replace it with "(*Young, supra*, 79 Cal.App.5th at p. 164.)"

15. On page 27, in the first paragraph that begins with "Also relevant", delete the second sentence beginning with "A good cause" and the following citation and replace them with the following sentence and citation:

4

The burden at the discovery stage is a good cause showing, the burden at the prima facie stage is higher, and the burden at the evidentiary hearing is higher still—proof of an RJA violation by a preponderance of the evidence. (§ 745, subds. (c), (d) & (e).)

16. On page 29, in the first paragraph after subheading IV., in the first and only sentence, add the phrase "as a stand-alone offense" to the end of the clause following "(2)" so that this clause reads: "(2) he has been charged with violating section 148, subdivision (a)(1) as a stand-alone offense;"

17. On page 30, delete the first sentence of the last paragraph beginning with "While the defendant" and replace it with the following sentence:

While the defendant in *Young* did present some evidence of racial profiling in his case, and while that evidence was not perceived as strong, it served to complement the statewide and out-of-county—and thus non-specific—statistics of racial disparities in charging he had offered.

18. On page 31, in the last sentence of the first full paragraph that begins with "Nor", which sentence begins with "For this reason", add the word "any" between the words "for" and "disclosure" at the end of the sentence so that the end of the sentence reads "for any disclosure."

19. On page 33, in the paragraph just before the "DISPOSITION", delete the last sentence beginning with the word "Instead" and replace it with the following two sentences:

Instead, where the statistical evidence Gonzales has presented supports an inference that Latinx people may have been disproportionately charged with resisting arrest and that non-Latinx people who were similarly situated by engaging in similar conduct may have been treated more leniently by not being so charged, this is sufficient to show that an RJA violation could or might have occurred. The trial court erred in its interpretation or application of section 745 to the contrary and stopped short of fully exercising its discretion as to the balance of the *Alhambra* factors in determining good cause and then potentially establishing the scope of any disclosure allowed; this constituted an abuse of discretion in the denial of Gonzales's motion for disclosure.

There is no change in the judgment.

5

The opinion in the above-entitled matter filed on November 21, 2024, was not certified for publication in the Official Reports. On December 10, 2024, and December 11, 2024, this court received and filed requests for publication of the non-published opinion. It appearing that the opinion meets certain standards for publication as specified in rule 8.1105 of the California Rules of Court, and for good cause, it now appears that the opinion should be published in the Official Reports. We grant the requests for publication of the opinion, and it is ordered certified for publication.

_____
Williams, P.J.

_____
Kuhnle, J.

_____
Chung, J.

6

Trial Court:                                  Santa Clara County Superior Court
                                              Superior Court No. C2215191


Trial Judge:                                  Hon. Brian J. Buckelew


Attorneys for Petitioner:                     Molly O'Neal
Isaac Gabriel Gonzales                            Public Defender
                                              Karina Alvarez
                                                  Deputy Public Defender


Attorneys for Real Party in Interest:         Jeffrey F. Rosen
The People                                        District Attorney
                                              Jeff H. Rubin
                                                  Deputy District Attorney


Attorneys for Amici Curiae
on behalf of petitioner:                      Brian Curtis McComas
Assemblymember Ash Kalra
Silicon Valley De-Bug


Attorneys for Amicus Curiae
on behalf of petitioner:                      Emi MacLean
                                              Grayce Zelphin
American Civil Liberties Union of
Northern California